Jani K. Rachelson (JK 0121)
Peter D. DeChiara (PD 0719)
Zachary N. Leeds (ZL 7353)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
Tel:  (212) 563-4100
Fax:  (212) 695-5436
jrachelson@cwsny.com
pdechiara@cwsny.com
zleeds@cwsny.com

Attorneys for Plaintiff John E. Lavin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X
                                                                :
JOHN E. LAVIN,                                                  :
                                                                :
                        *Plaintiff*,                            :
                                                                :
            - v. -                                              :
                                                                :
BRIEFLY STATED, INC. and BRIEFLY STATED                         :      Case No. 09-Civ.-8610 (CM)
INC. PROFIT SHARING PLAN,                                       :      (FM)
                                                                :
                        *Defendants*.                           :
                                                                :
----------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS SUMMARY JUDGMENT MOTION**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF CASES ..................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

UNDISPUTED FACTS ................................................................................................ 4

    Lavin's Employment at BS ..................................................................................... 4

    LF's Purchase of BS ............................................................................................... 4

    Conversion Of The ESOP Into The Plan ............................................................... 5

    BS's Failure To Contribute After 2005 Despite Its Continued Profitability ...................... 6

    The 2006 Allocation Of Forfeitures ....................................................................... 6

    LF's 401(k) Plan .................................................................................................... 8

    LF's Concern Over Section 410(b) Coverage Testing ........................................... 8

    The Committee's Denial of Lavin's Claim ............................................................. 9

    Lavin's Decision To File Suit ................................................................................. 11

    "Complete Discontinuance" Claims Brought By Three Other Plan Participants ............. 12

ARGUMENT ................................................................................................................ 12

I.    THE COURT MAY PROPERLY CONSIDER
      EVIDENCE OUTSIDE THE ADMINISTRATIVE RECORD ........................ 12

II.    *DE NOVO* REVIEW APPLIES TO THE STATUTORY QUESTION HERE ............... 13

III.    THE UNDISPUTED FACTS SHOW THAT THERE
       WAS A "COMPLETE DISCONTINUANCE OF CONTRIBUTIONS" ........................ 15

    A.    NO CONTRIBUTIONS HAVE BEEN MADE TO THE PLAN SINCE 2005 ... 15

        1.    Contributions From 2005 and Earlier Are Irrelevant .................................... 16

        2.    The Reallocation Of Forfeitures For 2006
             Does Not Count As A Contribution Under IRC §411(d)(3)(B) .................. 16

    B.    THERE IS A REASONABLE PROBABILITY THAT THE LACK OF
        CONTRIBUTIONS WILL CONTINUE ............................................................ 18

C.    THERE IS GOOD REASON TO BELIEVE
THAT THE COMMITTEE DENIED LAVIN'S
CLAIM TO AVOID THE REQUIREMENT OF FULL VESTING ................... 20

IV.    THE ONE-YEAR LIMITATIONS PERIOD UNILATERALLY
ADOPTED BY THE PLAN DOES NOT BAR LAVIN'S SUIT ................................... 21

A.    NO AGREEMENT BOUND LAVIN TO
THE ONE-YEAR LIMITATIONS PERIOD ....................................................... 21

B.    IT WOULD BE UNREASONABLE TO APPLY A ONE-YEAR
LIMITATIONS PERIOD TO A  COMPLETE DISCONTINUANCE
CLAIM WHOSE MERITS BECOME APPARENT ONLY AFTER
A PASSAGE OF YEARS .................................................................................... 22

C.    IT WOULD SERVE NO PURPOSE TO HOLD LAVIN'S
CLAIM TIME-BARRED SINCE SUIT BY OTHER PARTICIPANTS
WILL REQUIRE THE COURT TO DECIDE THE MERITS AND, IF
MERITORIOUS, REQUIRE PAYMENT TO LAVIN ........................................ 24

CONCLUSION ........................................................................................................................ 25

# TABLE OF CASES

**Page(s)**

*Albany Med. Ctr. v. Preferred Life Ins. Co.*,
  19 Misc.3d 209, 851 N.Y.S.2d 843 (N.Y. Sup. Ct. 2008) .................................................23

*Davis v. NMU Pension & Welfare Plan*,
  810 F. Supp. 532 (S.D.N.Y. 1992) .............................................................................22, 23

*Denzer v. Purofied Down Prods. Corp.*,
  474 F. Supp. 773 (S.D.N.Y. 1979) ..................................................................................22

*Ehrlich v. NYNEX Corp.*,
  949 F. Supp. 213 (S.D.N.Y. 1996) ..................................................................................14

*Harrison v. Metropolitan Life Ins.*,
  417 F. Supp. 2d 424 (S.D.N.Y. 2006) .............................................................................14

*Hess v. Hartford Life & Accident Ins. Co.*,
  274 F.3d 456 (7th Cir. 2001) ..........................................................................................15

*Int'l Fidelity Ins. v. Rockland*,
  98 F. Supp. 2d 400 (S.D.N.Y. 2000) ...............................................................................22

*Jeffries v. Pension Trust Fund*,
  2005 WL 2240034 (S.D.N.Y. 2005) ...............................................................................13

*Jeffries v. Pension Trust Fund*,
  2007 WL 245411 (S.D.N.Y. 2007) .................................................................................13

*Juliano v. Health Maintenance Org.*,
  221 F.3d 279 (2d Cir. 2000) ...........................................................................................12

*Mackensworth v. S.S. Am. Merchant*,
  28 F.3d 246 (2d Cir. 1994) .............................................................................................24

*McCauley v. First Unum Life Ins. Co.*,
  551 F.3d 126 (2d Cir. 2008) ...........................................................................................14

*Metropolitan Life Ins. v. Glenn*,
  128 S. Ct. 2343 (2008) ...................................................................................................14

*Miles v. New York State Teamsters*,
  698 F.2d 593 (2d Cir. 1983) ...........................................................................................21

*Morales v. Plaxall, Inc.*,
    541 F. Supp. 1387 (E.D.N.Y. 1982) ...................................................................22

*Pratt v. Petroleum Prods. Mgmt. Inc.*,
    920 F.2d 651 (10th Cir. 1990) ........................................................................22

*Prior v. Innovative Communication Corp.*,
    360 F. Supp. 2d 704 (D.V.I. 2005) .................................................................21

*Robinson v. Sheet Metal Workers' Nat'l Pension Fund*,
    441 F. Supp. 2d 405 (D. Conn. 2006) .............................................................13

*Stern v. Espeed, Inc.*,
    2006 WL 2741635 (S.D.N.Y. 2006)................................................................22

*U.S. v. Stein*,
    452 F. Supp. 2d 230 (S.D.N.Y.  2006), *vacated on other grounds*, 486 F.3d 753
    (2d Cir. 2007)............................................................................................21, 22

*Weil v. Retirement Plan Admin. Comm.*,
    913 F.2d 1045 (2d Cir. 1990)..........................................................................13

*Wilkins v. Mason Tenders Dist. Council Pension Fund*,
    445 F.3d 572 (2d Cir. 2006)............................................................................13

Plaintiff John E. Lavin ("Lavin") submits this memorandum of law in support of his motion for summary judgment.

## PRELIMINARY STATEMENT

Section 411(d)(3)(B) of the Internal Revenue Code ("IRC"), 26 U.S.C. §411(d)(3)(B), gives participants in a profit-sharing plan a nonforfeitable right to all the money in their plan accounts if there has been a "complete discontinuance of contributions" to the plan.  The undisputed facts in this case show that there has been a "complete discontinuance of contributions" to Defendant Briefly Stated Inc. Profit Sharing Plan ("Plan").  Accordingly, Lavin, a Plan participant, is entitled to all the money that was in his Plan account, not just the 40% that he received pursuant to the Plan's vesting schedule for his four years of service.

After Li & Fung USA ("LF") acquired Defendant Briefly Stated, Inc. ("BS") in 2005, the Plan was closed to new participants and, effective January 1, 2006, converted from an employee stock ownership plan ("ESOP") to a profit-sharing plan.  Since then, despite BS's continued profitability, no new employer contributions have been made to the Plan, nor is there any indication in the record that contributions will be made at any time in the future.  Accordingly, there has been a "complete discontinuance of contributions" under IRC §411(d)(3)(B).

In denying Lavin's claim that a "complete discontinuance" occurred, the Plan's Administrative Committee ("Committee") pointed to the fact that for 2006 the Plan reallocated to participants money that was already in the Plan that had been forfeited by employees who had left the company before becoming fully vested in their Plan accounts.  But the Committee's equating a forfeiture allocation with contributions to the Plan is not supported by any legal authority and is contrary to the IRC, which considers employer contributions and forfeitures separately in setting a ceiling on annual amounts that can be allocated to a participant's account.

The Committee's equating the 2006 forfeiture allocation with a contribution is also inconsistent with the Plan.  The Plan provides that only BS's Board of Directors ("BOD") -- not the Committee -- has authority to authorize an employer contribution, and the BOD never authorized one for 2006.  Moreover, the Plan's plain language defines an employer contribution as money paid *by* the company *to* the Plan; here the forfeiture money was already in the Plan.  The Committee's position is also at odds with the Plan's past practice -- and with common understanding -- of viewing contributions as cash infusions by the employer.  Indeed, the Plan's annual report filed with the IRS for 2006 asserted that no contribution had been made for that year.

The Committee had a strong motive to deny Lavin's claim, and thereby avoid having Plan participants obtain an immediate right to the full amount in their accounts, even if doing so entailed misconstruing the Plan and the law.  LF, which had one of its executives on the Committee that denied Lavin's appeal, and BS President Brad Egna ("Egna"), who held the other seat on the Committee, were both concerned about retaining key BS employees after the acquisition to ensure the company remained profitable.  Egna stood to gain personally in bonuses and other payments from LF if BS met certain profit targets.  Granting Lavin's claim would have run contrary to LF's and Egna's interest in having employees remain with the company.  First, it would have effectively eliminated the Plan's seven-year vesting schedule, which required employees to stay with the company to vest fully in their Plan accounts.  It would also have eliminated the pool of forfeiture money in the Plan; had Lavin's claim been granted, forfeiture money would have had to have been paid to him and to others who had left.  The prospect of sharing in the forfeiture money served as an added enticement for employees to stay with the company.

In evaluating whether there has been a "complete discontinuance of contributions" to the Plan within the meaning of IRC §411(d)(3)(B), the Court owes no deference to the Committee's determination, because statutory issues like this one are subject to *de novo* review.  Moreover, as applicable regulations make clear, the statutory question turns on "all the facts and circumstances" of the case, not just the limited set of facts that the Committee considered.

Defendants attempt to dodge Lavin's claim by arguing that his suit is barred by the one-year limitations period clause that they inserted into the Plan after Lavin had already left his employment with BS.  But Lavin never agreed, expressly or otherwise, to a limitations period shorter than the statutory six-year period and thus cannot be bound to the Plan's shorter one.  In any event, it would be unreasonable to apply a one-year limitations period because, as Defendants themselves concede, only after the passage of years can one determine whether a lack of contributions to a plan has blossomed into a "complete discontinuance."  In particular here, in denying Lavin's claim, the Committee asserted that a "complete discontinuance" requires three years of no contributions.  Lavin, who did not want to risk filing a meritless suit, thus waited to see whether there would be contributions for 2006, 2007 and 2008 and only sued after the deadline passed for the Plan to make a 2008 contribution.  Requiring him to have sued earlier would have been unreasonable and unfair.

It would also serve no purpose to hold Lavin's claim time-barred since three other Plan participants have asserted "complete discontinuance" claims identical to his.  The suit by these three will be unquestionably timely and will have to be litigated.  And if the Court finds in their suit that a "complete discontinuance" occurred, the Plan will have to provide all participants with the full amounts in their accounts, including Lavin.

For these reasons, more fully set forth below, Lavin's summary judgment motion should

be granted.

## **UNDISPUTED FACTS**

Lavin's Employment at BS

Lavin, who served as BS's chief financial and chief operations officer, was employed at the company from October 2000 through March 2005. May 10, 2010 Declaration of John E. Lavin ("Lavin Dec.") (filed herewith) at ¶2; Complaint ¶8; Plan's Answer ¶8. In October 2004, when Lavin informed Egna, BS's owner and president, of his decision to resign, Egna asked him to stay and Lavin agreed to stay a few more months. Lavin Dec. ¶3. At one point before Lavin left the company, Egna told him that he was concerned that he might lose other key employees. *Id*. ¶5. In particular, Egna, who was negotiating to sell BS to LF, mentioned that if the stock in BS's employee stock ownership plan ("ESOP") were sold, that would put a large amount of cash into the plan, and employees might be tempted to leave the company if this cash were made available to them. *See id*. ¶5.

LF's Purchase of BS

In September 2005, LF purchased BS from Egna. *See* Plan's Answer ¶11; *see also* D354.[1] Under the stock purchase agreement, LF paid part of the purchase price initially; Egna's receipt of the balance of the purchase price was made contingent on BS achieving certain pretax profits over a three-year "earn out" period that followed the purchase. Transcript of April 1, 2010 deposition of Alan Beckerman ("Beckerman") at 32, 34; D362 (§§2.2, 2.4).[2] The agreement further provided that Egna, who was to continue as BS's president during the three-

---

[1] "D____" are citations to documents produced by Defendants in this action, copies of which are set forth in the "Record Citations to Plaintiff's Summary Judgment Motion," filed herewith. (Redactions to the documents were made by Defendants).

[2] Cited pages in deposition transcripts are contained in "Deposition Excerpts In Support of Plaintiff's Summary Judgment Motion," filed herewith.

year "earn out" period, would receive an annual bonus the size of which would depend on the pretax profits that BS earned.  Beckerman 30-32; D413 (§5(b)).

As part of its acquisition of BS, LF purchased all of the BS shares that were then in BS's ESOP, putting about $22.6 million into the ESOP.  Beckman 17; D119.

Section 6.8(b) of the stock purchase agreement provided that during the three-year "earn out" period, LF "shall continue to maintain, and shall not terminate" the ESOP.  D386. Termination of the ESOP would have entitled participants to the full amounts in their accounts, regardless of the vesting schedule.  *See* 26 U.S.C. §411(d)(3)(A).

According to Alan Beckerman, the LF executive who served as Defendants' Rule 30(b)(6) witness, Beckerman 4-5, the parties decided to keep the ESOP in place out of a concern that without it, "some employees may leave."  Beckerman 99.  BS was a profitable company when LF acquired it and LF wanted to avoid any disruptions during the "earn out" period.  *Id*. 34-35.  In particular, LF wanted to avoid the loss of key employees.  *Id*. 35-36.

Egna, too, was concerned about employees leaving:  at the time of the acquisition, Egna expressed his concern that he "not lose his key people."  *Id*. 98.  Egna did not want to lose key employees in part out of his concern about earning the contingent payments during the "earn out" period.  *Id*. 99.

Although the stock purchase agreement required LF to maintain and not terminate the ESOP, it did not require that contributions be made to it.  Beckerman 36-37.

Conversion Of The ESOP Into The Plan

Effective January 1, 2006, the ESOP converted into the Plan.  D6-D7; Beckerman 51.  As of that date, the Plan was closed to new participants.  D15 (§4.01(b)); Beckman 53.

The Plan provides that the BOD has sole authority to decide whether an employer contribution -- referred to as a "Profit Sharing Contribution" -- will be made to the Plan for a

given year. D17 (§6.01(b)); Beckerman 55. Section 6.02 of the Plan makes clear that an employer contribution must be a payment by BS to the Plan: "Profit Sharing Contributions, *if any*, *shall* be paid *by the Company* in cash *to the Trust Fund* …" D17 (emphasis added). Section 8.02 of the Plan further clarifies this: "All contributions made on behalf of a Participant shall be paid *to* the Trustee …." D19. The deadline under the Plan for making a contribution is September 15 of the year following the year for which the contribution is made. D17 (§6.02); Beckerman 58.

BS's Failure To Contribute After 2005 Despite Its Continued Profitability

After September 2005, the BOD was composed of five LF executives who met twice a year, keeping minutes of their meetings. Beckerman 9-14. The record contains no evidence that at any time after the Plan became effective on January 1, 2006, the BOD discussed putting -- let alone decided to put -- additional money into the Plan. *See* May 6, 2010 Declaration of Peter D. DeChiara ("DeChiara Dec.") (filed herewith), at ¶¶3-6. In fact, no additional employer money was put into the Plan. Beckerman 18-19. The Plan's Form 5500 reports to the IRS for 2006, 2007 and 2008 indicate that no contributions were made to the Plan for those years. D192 (no entry for line 2a(1)); D200 (same); D207 (same). During each of those years, BS was profitable, earning pretax profits of $18.4, $17.9 and $14.6 million in 2006, 2007 and 2008, respectively, on gross sales of $107, $103 and $117 million. Beckerman 69-70. BS continues to be profitable. Beckerman 35; Beckerman 70-71 (setting forth 2009 pretax profits).

The 2006 Allocation Of Forfeitures

The Plan requires that a participant complete seven years of service to vest fully in his account. D22 (§10.01(b)). If a participant terminates employment before fully vesting, the non-vested portion of his account is treated as a forfeiture. D22 (§10.02(a)).

At the end of 2006, the Plan had a forfeiture balance of $998,000. D113. In February

2007, the Committee decided to allocate, for 2006, approximately $544,000 of this forfeiture money to other Plan participants.  D111-D113.

The record contains no minutes of the BOD showing that the BOD decided that there would be an employer contribution for 2006 or that the allocation of forfeiture money for 2006 constituted an employer contribution.  *See* DeChiara Dec. ¶¶3-6.  In his valuation report for 2006, which issued in February 2007, the Plan's actuary, David Weinstock, referenced the forfeiture allocation but nonetheless concluded that "[t]here was no contribution made" to the Plan for 2006.  D466.  Weinstock, an actuary with 25-30 years experience, including with profit-sharing plans, *see* Transcript of April 6, 2010 deposition of David Weinstock ("Weinstock") at 5, explained that in reporting that there had been no contribution for 2006, he "was referring to what is *typically defined as a contribution*, which is *an injection of new money* contributed to the plan *by the employer*."   Weinstock 6 (emphasis added).  The Plan's conclusion that there had been no contribution for 2006 is also reflected on its Form 5500 report filed with the IRS for that year.  D192 (no entry for line 2a(1)).

Weinstock also considered forfeiture allocations and employer contributions separately in his valuation report for the prior year, 2005.  *Compare* D670 (line 3(b)) (forfeiture allocation) *with* D669 (line 2) (employer contribution); *see* Weinstock 21-24.

Since making the forfeiture allocation for 2006, the Plan has made no further forfeiture allocations.  Beckerman 78.  The amount in the Plan's forfeiture account (which includes the balance of Lavin's account) has since grown to over $3.3 million.  Beckerman 100.  Egna used this forfeiture money as an enticement for employees to remain with the company:  at one point, Egna tried to dissuade BS employee Farrisha Mohammed from resigning by telling her that it would be crazy for her to quit because employees who stayed with the company would share in

the forfeiture money.  Lavin Dec. ¶6.

LF's 401(k) Plan

After LF's acquisition of BS, BS employees who were Plan participants also became

participants in LF's 401(k) plan ("LF Plan").  Beckerman 47; D124.  Like all the other eligible

participants in the LF Plan, eligible BS employees received an employer "match" contribution to

their LF Plan accounts.  Beckerman 50.

In addition to BS employees, the LF Plan includes employees of six other companies that

LF acquired.  D218.  The 401(k) plans of these six other LF subsidiaries were merged into the

LF Plan, D218 n.1, leaving BS employees as the only employees of an LF subsidiary who

participate in their own company's plan as well as in LF's Plan.  D218.

LF's Concern Over Section 410(b) Coverage Testing

On December 20, 2006, Weinstock told Graham Schell, an executive in LF's human

resources department, Beckerman 44, that if Weinstock did the "coverage tests" under IRC

§410(b), 26 U.S.C. §410(b), the Plan would "likely fail" and "have to include other participants"

in the Plan.  D133; Weinstock 6-8.  Schell responded with alarm, writing that "this raises a huge

red flag for me."  D133.  He added:  "Dave [Weinstock] is very concerned as this will continue

to be an issue for 2007, 2008 and forward."  *Id*.

In general, IRC §410(b) requires that a tax-qualified plan must benefit a certain

percentage of the non-highly compensated employees of both the employer and other employers

in the employer's "controlled group."  *See* DeChiara Dec., Ex. A, at 5; Weinstock 7-8.  Because

LF, as BS's parent, was part of BS's "controlled group," DeChiara Dec., Ex. A at 5; Beckerman

19, §410(b) coverage testing of BS's Plan would have had to consider whether contributions to

Plan participants benefited the non-highly compensated employees of both BS and LF.  If the

Plan failed the test, according to Weinstock, monies might have had to be contributed to benefit

additional employees.  Weinstock 11; D133.

At the time that Weinstock advised Schell in December 2006, he believed the Plan would likely fail the coverage tests because LF had so many more employees than BS.  Weinstock 10. In 2007 and 2008, for example, the LF Plan had 1,281 and 1,305 participants, respectively, Beckerman 26-27, while the BS Plan had 52 and 46.  *See* D197, 204.

Weinstock clarified in his deposition that if the Plan failed the §410(b) coverage tests, there might have been remedies other than providing benefits to LF employees, such as taking the highly compensated employees out of the BS Plan, but Weinstock had no recollection of explaining any such alternative remedies to Schell.  Weinstock 15.

Weinstock did not perform §410(b) coverage testing for 2006 that took into account LF employees because, as he later learned, a statutory one-year transition period for newly acquired companies excused consideration of LF employees for that year.  Weinstock 9.  But Defendants admit that had there been contributions to the Plan in 2007 or thereafter, the §410(b) testing would have required consideration of the LF employees.  DeChiara Dec., Exhibit A, at 6 (Plan's counsel explaining that beginning in 2007, §410(b) would require "inclusion of Li & Fung employees in the Plan's coverage testing").

The Committee's Denial of Lavin's Claim

In March 2007, Lavin received a distribution from the Plan of $598,600.20, which represented 40% of his account balance.  D83; Lavin Dec. ¶7.  Lavin had completed four years of service with BS, D82, and under the Plan's vesting schedule, a participant with four years of service is 40% vested in his account.  D22 (§10.01(b)).

After consulting with counsel, Lavin decided to bring a claim asserting that he was entitled to the balance in his account, since there had been a "complete discontinuance of contributions" to the Plan.  Lavin Dec. ¶7.  In his May 30, 2007 claim letter, Lavin asserted --

9

based, among other things, on the absence of contributions after 2005 and the closing of the Plan to new participants -- his belief that BS had decided "to discontinue making contributions to the Plan following the Company's acquisition by [LF]." D74. Lavin's letter claimed that since the last contribution made to the Plan was in 2005, the "complete discontinuance" became effective on the last day of the following year, December 31, 2006, as set forth in 26 C.F.R. §1.411(d)-2(d)(2). D78.

The Committee, which included Egna and Beckerman, denied Lavin's claim, stating in its November 19, 2007 denial letter that there had been no "complete discontinuance of contributions" within the meaning of IRC §411(d)(3)(B). Beckerman 79-80; D86, D89. In addition to relying on IRS regulations interpreting the statute, D85-86, the Committee cited the Internal Revenue Manual, which it read as providing that "a complete discontinuance of contributions *cannot occur* unless and until substantial contributions are not made for 3 out of five years." D86 (emphasis added). The denial letter pointed out that there had been contributions to the ESOP each year from 2000 through 2005. D86. It also asserted that there had been a contribution in 2006 since "forfeitures function as deemed Profit Sharing Contributions." D87.

At his deposition, Beckerman was unable, until prompted by BS's counsel, to explain what section of the Plan supported the Committee's conclusion that "forfeitures function as deemed Profit Sharing Contributions." Beckerman 84-86. Finally, after reviewing the denial letter that was prepared by the Plan's counsel, *see* Beckerman 79, Beckerman pointed to Section 10.04(a), which provides that "Forfeitures shall be used to pay administrative expenses of the Plan and/or to reduce the amount of Profit Sharing Contributions which are to be made by a Participating Employer for the current or following Plan Year." D23.

Beckerman testified that in reaching its determination that "forfeitures function as deemed Profit Sharing Contributions," the Committee did not discuss any other sections of the Plan. Beckerman 86. Accordingly, it never considered Sections 6.02 or 8.02, which define a contribution as cash paid by the company to the Plan. *See* D17, D19. Nor did the Committee consider Weinstock's 2006 valuation report finding that there were no contributions for 2006. Beckerman 93-94; D466.

Lavin appealed the Committee's denial of his claim. D90-94. By letter dated March 31, 2008, the Committee denied his appeal on the same grounds that it denied his claim, D95-105, asserting, once again, its interpretation of the Internal Revenue Manual as setting a minimum of no substantial contributions for three out of five years before a "complete discontinuance" can be found, D101.

Egna and Beckerman were the only two members of the Committee present when it denied Lavin's appeal. *See* D114. At their Committee meeting, Egna pointed to the contributions made to the ESOP through 2005 and also, in an attempt to justify the Committee's position that the 2006 forfeiture allocation counted as a contribution, referred to "the Plan's mechanism for recharacterizing forfeitures as profit sharing contributions." D115. There was no discussion at the meeting of any Plan provision other than Section 10.04(a). Beckerman 90. Nor was there any reference to Weinstock's 2006 valuation report finding no contribution for 2006. Beckerman 93-94; D466.

Lavin's Decision To File Suit

Based on the Committee's denial of his claim and appeal, it was apparent to Lavin that the Committee took the position that a "complete discontinuance of contributions" could not occur unless and until there had been no substantial contributions for three out of five years. *See* Lavin Dec. ¶8. Because he did not want to risk filing a meritless lawsuit, Lavin decided to wait

before suing to see whether there were contributions to the Plan for the three years after 2005,

namely, for 2006, 2007 and 2008. *See id*. ¶9. He filed suit in October 2009, just after the Plan's

September 2009 deadline passed for making a contribution for 2008. D17 (§6.02); Beckerman

58.

<u>"Complete Discontinuance" Claims Brought By Three Other Plan Participants</u>

On April 9, 2010, the Committee denied the claims of three other former BS employees

who, like Lavin, claimed that the Plan experienced a "complete discontinuance of contributions"

effective December 31, 2006 and therefore that they were entitled to the full amount in their Plan

accounts, despite their not having fully vested under the Plan's vesting schedule. *See* Lavin Dec.

Ex. A. These three, who are represented by the same counsel as Lavin, *see* Lavin Dec. ¶12,

appealed the Committee's decision by letter dated April 22, 2010, *see id*., Ex. B, and intend to

sue promptly if the Committee denies their appeal, *see id*. ¶12. Indeed, they sought to join

Lavin's suit, but Defendants refused their request to be excused from exhausting the Plan's

administrative claims procedure, *id*. ¶12.

**<u>ARGUMENT</u>**

**I.      THE COURT MAY PROPERLY CONSIDER
         <u>EVIDENCE OUTSIDE THE ADMINISTRATIVE RECORD</u>**

A court may in its discretion review evidence from outside the administrative record if

there is good cause to do so. *Juliano v. Health Maintenance Org.*, 221 F.3d 279, 289 (2d Cir.

2000). The question of whether there was a "complete discontinuance of contributions" under

IRC Section 411(d)(3)(B) depends on "*all* the facts and circumstances," 26 C.F.R. §1.411(d)-

2(d)(1) (emphasis added), of the case. This Court has recognized that in a case that turns on "all

the facts and circumstances," all relevant facts should be considered, not just those contained in

12

the bare administrative record. *See, e.g., Jeffries v. Pension Trust Fund*, 2007 WL 245411, at *4

(S.D.N.Y. 2007) (noting parties' "extensive discovery" and considering facts well beyond

administrative record in Section 411(d)(3) case decided under the "all the facts and

circumstances" standard); *Jeffries v. Pension Trust Fund*, 2005 WL 2240034, at *2 (S.D.N.Y.

2005) (same case; finding "no reason to preclude relevant information"). Indeed, because, as

explained below, *de novo* review applies to the statutory issue in this case, the Court should not

limit itself to the facts on which the Committee relied.

## II.    *DE NOVO* REVIEW APPLIES TO THE STATUTORY QUESTION HERE

Regardless of what a plan document provides, courts apply *de novo* review to a plan

administrator's determination of a legal question. *See Wilkins v. Mason Tenders Dist. Council

Pension Fund*, 445 F.3d  572, 581 (2d Cir. 2006); *Weil v. Retirement Plan Admin. Comm.*, 913

F.2d 1045, 1049 (2d Cir. 1990) ("[w]hen an eligibility determination by plan administrators turns

on a question of law, courts have not hesitated to apply a *de novo* standard of review"), *other

sections of decision vacated*, 933 F.3d 106 (2d Cir. 1991); *Robinson v. Sheet Metal Workers'

Nat'l Pension Fund*, 441 F.Supp.2d 405, 416 (D. Conn. 2006). In particular, *de novo* review

applies when a court in a Section 411(d)(3) case must examine "all the fact and circumstances"

to resolve the statutory issue. *See Weil*, 913 F.2d at 1049 (applying *de novo* review to Section

411(d)(3) case); *Jefferies*, 2007 WL 2454111, at *6 (same).

Here, the Committee's determination "that a complete discontinuance of contributions

did not occur" within the meaning of IRC Section 411(d)(3)(B), *see* D99-D101, was a legal

determination. Because the Committee decided a legal issue, *de novo* review applies. Indeed,

deferring to the Committee would make no sense since the Court must review "all the facts and

circumstances" in the case, 26 C.F.R. §1.411(d)-2(d)(1), not just the limited set of facts

considered by the Committee.

13

But even if the Court somehow determines that the arbitrary-and-capricious standard of review applies to the Committee's decision, it would make no difference, since an error of law -- such as a misapplication of IRC §411(d)(3)(B) -- *is* arbitrary and capricious. *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008) (denial of benefits arbitrary and capricious if "'erroneous as a matter of law'") (citation omitted); *Ehrlich v. NYNEX Corp.*, 949 F. Supp. 213, 218 (S.D.N.Y. 1996) (decision arbitrary and capricious "if it rests on an error of law"); *see also Harrison v. Metropolitan Life Ins.*, 417 F.Supp.2d 424, 436 (S.D.N.Y. 2006) ("even under the arbitrary and capricious standard, questions of law are reviewed *de novo*").

Even the Committee's determination that forfeitures count as contributions deserves no deference. The Committee purported to interpret Plan language in finding that the Plan allowed forfeiture allocations to be characterized as contributions. But the Committee's determination that forfeitures count as contributions *for purposes of IRC §411(d)(3)(B)* is a legal determination not subject to deference.

In any event, even if the Court finds that the Committee had discretion to decide that forfeitures count as contributions, ample grounds exist to find that the Committee abused its discretion. Egna had an "immediate financial interest," *Metropolitan Life Ins. v. Glenn*, 128 S. Ct. 2343, 2348 (2008), in the outcome, creating a conflict of interest with his fiduciary duty that the Court must weigh in determining whether there was an abuse of discretion, *see id*. at 2350; *accord McCauley*, 551 F.3d at 133. Moreover, the Committee's determination runs contrary to Plan language -- namely, Sections 6.02 and 8.02, *see* D17, D19 -- that clearly defines contributions as payments to the Plan, not reallocations of money already in the Plan. *See McCauley*, 551 F.3d at 133 (plan administrator's decision may be arbitrary if inconsistent with the plan's plain words). That the Committee *did not even consider* this clear Plan language

14

shows that it acted arbitrarily.  *See, e.g., Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456,

462-463 (7th Cir. 2001) (failure to review pertinent language may render decision arbitrary).

## III.    THE UNDISPUTED FACTS SHOW THAT THERE WAS A <u>"COMPLETE DISCONTINUANCE OF CONTRIBUTIONS"</u>

In determining whether there has been a "complete discontinuance of contributions"

under §411(d)(3)(B), a court should consider whether (1) contributions have been "recurring and

substantial"; (2) "there is any reasonable probability that the lack of contributions will continue

indefinitely"; and (3) the employer may be denying that there has been a complete

discontinuance in "order to avoid the requirement of full vesting." 26 C.F.R. §1.411(d)-2(d)(1).

Here, all three factors weigh clearly in favor of finding a "complete discontinuance."

### A.    NO CONTRIBUTIONS HAVE BEEN MADE <u>TO THE PLAN SINCE 2005</u>

Far from "recurring and substantial" contributions, 26 C.F.R. §1.411(d)-2(d)(1)(ii), there

have been *no* contributions to the Plan since 2005, as indicated on the Form 5500's filed by BS

for 2006, 2007 and 2008.  D192 (no entry for line 2a(1)); D200 (same); D207 (same).  The

Internal Revenue Manual, at §7.12.1.2.6 (2003)[3], advises that a "complete discontinuance"

should be considered "[i]f the employer has failed to make substantial contributions in 3 out of 5

years, and there is a pattern of profits earned."  During the three-year period from 2006 through

2008, BS failed to contribute to the Plan while earning ample profits each year.  Beckerman 69-

70.

Because the last employer contribution to the Plan occurred in 2005, the "complete

discontinuance" occurred on the last day of the following year, namely, December 31, 2006.  *See*

26 C.F.R. §1.411(d)-2(d)(2).

---

[3] http://www.irs.gov/irm/part7/irm_07-012-001.html#d0e71.

1.      **Contributions From 2005 and Earlier Are Irrelevant**

In denying Lavin's claim, the Committee noted that recurring and substantial contributions were made for the years 2000 through 2005.  D86; D102.  But these contributions are irrelevant:  Lavin claims that the "complete discontinuance" began *after* 2005.  D74 (claim letter referencing "Company's decision to discontinue making contributions to the Plan *following* the Company's acquisition by [LF]") (emphasis added).

2.      **The Reallocation Of Forfeitures For 2006 Does Not Count As A Contribution Under IRC §411(d)(3)(B)**

In denying Lavin's claim, the Committee also took the position that the 2006 allocation of forfeiture money *already* in the Plan, Beckerman 73, counted as an employer contribution *to* the Plan.  D102-03.  The Committee's position contradicts what BS reported to the government in its 2006 Form 5500, that there was no contribution for 2006.  D192 (no entry for line 2a(1)).  It also runs contrary to the understanding of BS's own actuary regarding what constitutes a contribution:  Weinstock, who has 25-30 years of experience as an actuary, including with profit sharing plans, *see* Weinstock 5, testified that when he reported in his 2006 valuation report that there was no contribution to the Plan for that year despite the forfeiture allocation, he "was referring to what is *typically defined as a contribution*, which is *an injection of new money* contributed to the plan *by the employer*."  Weinstock 6 (emphasis added).  This typical understanding of a contribution being an injection of cash from the employer was also the Plan's understanding:  the Plan's valuation report for 2005, for example, reported -- separately -- employer contributions of new money, on the one hand, and forfeiture allocations, on the other.  *Compare* D669 (line 2) *with* D670 (line 3(b)); *see* Weinstock 21-24.

We are aware of no case or other legal authority equating forfeitures with employer contributions and, in particular, no legal authority holding that forfeitures may be deemed

employer contributions for purposes of avoiding a determination that there has been a "complete discontinuance of contributions" within the meaning of IRC §411(d)(3)(B). On the contrary, the IRC refers to forfeitures and employer contributions as separate and distinct. Section 415(c) of the IRC, 26 U.S.C. §415(c), sets an annual dollar limit on the amount of "[c]ontributions and other additions" which may be added to the account of a plan participant. The statute defines the term "annual addition" to include -- separately -- employer contributions, employee contributions and forfeitures. *Id*. §415(c)(2).

The Committee's conflating forfeitures and employer contributions runs contrary not only to common understanding and the IRC but also to the Plan itself. Section 6.02 of the Plan makes clear that employer contributions "*if any*, *shall* be paid *by the Company* in cash *to* the Trust Fund." D17 (emphasis added). This language admits to no exception: all employer contributions must be payments *from* BS *to* the Plan. Section 8.02 underscores the point, providing that "[a]ll contributions … shall be paid to the Trustee." D19.

Without any discussion of either Section 6.02 or 8.02, *see* Beckerman 86, 90, or of Weinstock's valuation report finding no contribution for 2006, *see* Beckerman 93-94, the Committee accepted the assertion by Egna -- who had a personal financial stake in the result -- that the Plan had a "mechanism of recharacterizing forfeitures as profit sharing contributions." D115. The Plan has no such "mechanism." Tellingly, Beckerman, the Defendants' Rule 30(b)(6) witness who was the other member on the Committee, could not identify at his deposition what provision in the Plan says that forfeitures function as contributions. Beckerman 84-85. Only after being prompted by BS's counsel to review the denial letter, *see* Beckerman 85-86, did Beckerman finally respond by pointing to §10.04(a). Beckerman 86. Plan §10.04(a) provides in pertinent part that forfeitures may be used "to *reduce* the amount of Profit Sharing

Contributions which are to be made by a Participating Employer for the current or following

Plan Year." D23 (emphasis added). The 2006 forfeiture allocation could not have been used to

*reduce* the Profit Sharing Contributions for that year or the next because there were *no*

contributions to reduce. Only the BOD had authority to decide that a contribution would be

made for a given year, D17 (§6.01(b)); Beckerman 55, and there is no evidence showing that the

BOD authorized a contribution for either 2006 or 2007. *See* DeChiara Dec. ¶¶3-6. Because only

the BOD had authority to make contributions, and it authorized none for 2006, the Committee's

2006 allocation of forfeitures could not have been a contribution.

In sum, since 2005 there have been no contributions to the Plan, let alone "recurring and

substantial" contributions. *See* 26 C.F.R. §1.411(d)-2(d)(1)(ii).

### B. THERE IS A REASONABLE PROBABILITY THAT THE LACK OF CONTRIBUTIONS WILL CONTINUE

Further supporting Lavin's claim is the "reasonable probability that the lack of

contributions will continue indefinitely." 26 C.F.R. §1.411(d)-2(d)(1)(iii). LF's three-year

obligation to maintain the Plan, which never required it to make contributions, Beckerman 36-37,

has now expired. D356 ("Contingent Pay Period" ended September 30, 2008). Even if -- despite

its practice of merging the plans of its subsidiaries into the LF Plan, *see* D218 n.1 -- LF decides

to continue to maintain the Plan, there is good reason to believe that it will not put new money

into it.

First, there is no evidence that the BOD -- the sole body authorized to decide that a

contribution will be made, *see* D17 (§6.01(b)); Beckerman 55 -- has even considered making any

future contributions. *See* DeChiara Dec. ¶¶3-6. BS put no new money into the Plan while

earning ample profits from 2006 through 2008, *see* Beckerman 69-70, so there is no reason to

believe future profitability will cause it to make contributions.  Also, to give a contribution to eligible Plan participants in addition to the employer "match" they receive under the LF Plan, *see* Beckerman 50, would be to treat the BS employees better than all the other employees of LF subsidiaries, who participate only in the LF Plan.  *See* D218.  There is nothing in the record suggesting that LF would want to engage in such disparate treatment of its workforce.

In addition, any future contributions would require "coverage testing" under IRC §410(b) that would include LF employees.  *See* DeChiara Dec., Ex. A at 6 (Plan counsel admitting that such "coverage testing" would be required starting in 2007).  The prospect of failing such testing, and possibly having to add more participants as a remedy, raised a "huge red flag" for LF when Weinstock raised the issue in 2006, D133, and there is no reason to believe LF would be less concerned about it now.  Weinstock believed in 2006 that the Plan would likely fail such testing because of the relative number of LF versus BS employees.  *See* Weinstock 10.  Since LF employees continue to far outnumber BS employees, *compare* Beckerman 26-27 *with* D197, 204, there is no reason to believe the Plan's chances of passing the coverage tests have improved.

The possibility of having to add more participants to the Plan would run contrary to BS's intent -- embodied in Plan language -- to close the Plan to new participants.  *See* D15 (§4.10(b)), Beckerman 53.  Moreover, if hundreds of new participants were added to the Plan, making a contribution of a meaningful size to each could be extremely costly.  While §410(b) testing that includes LF employees may not pose an insurmountable hurdle, it certainly raises sufficient complications and possible undesirable consequences to discourage future contributions.

In sum, there is at least a "reasonable probability that the lack of contributions will continue indefinitely."  26 C.F.R. §1.411(d)-2(d)(1)(iii).

**C.    THERE IS GOOD REASON TO BELIEVE THAT
THE COMMITTEE DENIED LAVIN'S CLAIM TO
AVOID THE REQUIREMENT OF FULL VESTING**

The last factor too supports Lavin's case:  there is good reason to believe that the

Committee denied his claim "in order to avoid the requirement of full vesting."  26 C.F.R.

§1.411(d)-2(d)(1)(i).  Egna -- who made up half the Committee that denied Lavin's appeal, *see*

D114 -- stood to gain directly if BS achieved certain profitability targets, both in the form of

bonus payments and contingent purchase price payments from LF.  Beckerman 30-34; D362

(§§2.2, 2.4); D413 (§5(b)).  There is no dispute that Egna was concerned about BS losing key

staff, *see* Beckerman 98-99; *see also* Lavin Dec. ¶5, in part out of his concern about earning

these contingent payments during the "earn out" period.  *See* Beckerman 99.  LF, whose interests

were represented on the Committee by Beckerman, also wanted to avoid the loss of key

employees in order to keep BS profitable.  Beckerman 34-36.

The Plan's seven-year vesting schedule, *see* D22 (§10.01(b)), meant that staff had to stay

with BS to obtain the full amounts in their accounts.  Granting Lavin's claim would have meant

that Plan participants were entitled to the full amount in their Plan accounts regardless of the

vesting schedule.  Indeed, under the terms of the Plan, participants would have been entitled to

payment as soon as practicable.  Beckerman 54; D29 (§13.01(e)).  By effectively eliminating the

vesting schedule as a mechanism for retaining key employees, granting Lavin's claim would

have cut directly against Egna's and LF's interest in having key employees stay.

Moreover, the prospect of BS staff sharing the large pot of money in the Plan's forfeiture

account served as an additional enticement for them to stay.  Indeed, Egna used the prospect of

employees sharing in forfeiture money to try to dissuade at least one employee from leaving.

Lavin Dec. ¶6.  Granting Lavin's claim would have depleted the Plan's forfeiture account by

requiring the Plan to pay unvested amounts, which would otherwise have been deemed

forfeitures, to Lavin and other former employees who left before becoming fully vested. It would have thus eliminated, or at least significantly eroded, one incentive for employees to stay.

Because full vesting would have cut against Egna's and LF's interest in having employees stay, there is good reason to believe that Lavin's claim was denied "in order to avoid the requirement of full vesting." 26 C.F.R. §1.411(d)-2(d)(1)(i).

In sum, all the relevant factors support a finding that there was a "complete discontinuance of contributions." *See* 26 C.F.R. §1.411(d)-2(d)(1).

## IV.    THE ONE-YEAR LIMITATIONS PERIOD UNILATERALLY ADOPTED BY THE PLAN DOES NOT BAR LAVIN'S SUIT

Lavin's October 2009 complaint is clearly timely under the six-year statute of limitations applicable to ERISA actions. *See Miles v. New York State Teamsters*, 698 F.2d 593, 598 (2d Cir. 1983) (6-year limitations period applies to ERISA claims). Defendants nonetheless argue that the suit is barred by the one-year limitations period unilaterally adopted by the Plan after Lavin resigned. This argument fails.

### A.    NO AGREEMENT BOUND LAVIN TO THE ONE-YEAR LIMITATIONS PERIOD

New York CPLR §201 allows for a shorter limitations period than the one provided by law, but only if "prescribed by written *agreement*" (Emphasis added). Lavin never agreed to the one-year limitations period and cannot be bound by it.

Like any agreement, a contractual clause restricting an employee's right to sue must be accepted by the party to be bound. Such a clause cannot bind an individual whose employment ceased before the clause took effect. *See, e.g., U.S. v. Stein*, 452 F.Supp.2d 230, 249 (S.D.N.Y. 2006) (arbitration clause in partnership agreement not binding on partners who left before clause was adopted), *vacated on other grounds*, 486 F.3d 753 (2d Cir. 2007). Indeed, a plan participant accepts the plan's terms by his continued employment. *See Prior v. Innovative Communication*

*Corp.*, 360 F.Supp.2d 704, 714 (D.V.I. 2005); *Morales v. Plaxall, Inc.*, 541 F. Supp. 1387, 1391

(E.D.N.Y. 1982).  An employee thus cannot be deemed bound by plan terms promulgated after

the employee's termination.  *See Pratt v. Petroleum Prods. Mgmt. Inc.*, 920 F.2d 651, 661 (10th

Cir. 1990) (unilateral adoption of plan amendment after employee's termination not effective as

against employee); *Denzer v. Purofied Down Prods. Corp.*, 474 F. Supp. 773, 776-77 (S.D.N.Y.

1979) (same); *see also Stern v. Espeed, Inc.*, 2006 WL 2741635, at *2 (S.D.N.Y. 2006)

(continued employment is consideration for arbitration agreement).

       Here, Lavin ceased working for BS in March 2005, *see* Complaint ¶8; Plan's Answer ¶8,

before the one-year limitations clause became effective on January 1, 2006, *see* D7 (§1.03);

Beckerman 51.  Since CPLR §201 requires an "agreement" to shorten a limitations period and

since Lavin never agreed, implicitly or otherwise, to the one-year limitations clause here, *see*

Beckerman 101-02, it does not bind him.  *See Stein*, 452 F.Supp.2d at 249.

       Defendants' argument that Lavin had *notice* of the one-year provision before he sued

misses the point.  Lavin may have learned of it after he left BS, but he never *agreed* to it and

basic contract principles, as well as CPLR §201, therefore preclude his being bound by it.  *See*

*Davis v. NMU Pension & Welfare Plan*, 810 F. Supp. 532, 534 (S.D.N.Y. 1992) (rejecting plan's

shortened limitations period because the parties, including the plaintiff plan participant, "did not

mutually agree" to it).

      **B.**    **IT WOULD BE UNREASONABLE TO APPLY**
             **A ONE-YEAR LIMITATIONS PERIOD TO A**
             **COMPLETE DISCONTINUANCE CLAIM WHOSE**
             <u>**MERITS BECOME APPARENT ONLY AFTER A PASSAGE OF YEARS**</u>

       Even if Lavin could somehow be deemed to have agreed to the one-year limitations

period, it should still not be applied here because doing so would be unreasonable.  Contractually

shortened limitations periods, which courts view "with caution," *Int'l Fidelity Ins. v. Rockland*,

98 F.Supp.2d 400, 409 (S.D.N.Y. 2000), are only upheld if reasonable, *see id.*; *Albany Med. Ctr. v. Preferred Life Ins. Co.*, 19 Misc.3d 209, 214, 851 N.Y.S.2d 843, 847 (N.Y. Sup. Ct. 2008). The reasonableness of the length of a limitations period under CPLR 201 must evaluated under the circumstances of the particular case. *See Davis*, 810 F. Supp. at 534 (finding unreasonable "under the circumstances" a benefit plan's contractual limitations period of two years and ninety days).

It is unreasonable to apply a one-year limitations period to a "complete discontinuance" claim. Indeed, we are not aware of any case that does so. As Defendants themselves have explained, there must be "at minimum, a cessation of employer contributions for some period of years" for the cessation to "blossom into a 'complete discontinuance.'" DeChiara Dec., Exh. A, at 5 (letter from Plan counsel). A one-year limitations period would force a plan participant to sue prematurely, before sufficient years had passed to show that a cessation of contributions did "blossom" into a complete discontinuance. By adopting limitations periods that force such premature suits, plans could effectively immunize themselves from the full vesting requirement of IRC §411(d)(3)(B).

Applying the one-year limitations period would be particularly unreasonable and unfair here because in denying Lavin's claim, the Committee specifically told him, based on its reading of the Internal Revenue Manual, that a complete discontinuance "*cannot* occur *unless and until* substantial contributions are not made for 3 out of five years." D86 (emphasis added). To make sure that his suit had merit, Lavin thus waited to see whether the post-2005 absence of contributions continued for three years: 2006, 2007 and 2008. *See* Lavin Dec. ¶9. He filed suit in October 2009, promptly after the Plan's September 2009 deadline to make a 2008 contribution had passed. *See* D17 (§6.02); Beckerman 58. Since Defendants represented to Lavin that three

years of no substantial contributions was the minimum for a "complete discontinuance" claim, it would be unfair and unreasonable to allow them to now benefit from a limitations period that would have required Lavin to sue before knowing whether three years passed without contributions and thus whether he had a cause of action.

### C. IT WOULD SERVE NO PURPOSE TO HOLD LAVIN'S CLAIM TIME-BARRED SINCE SUIT BY OTHER PARTICIPANTS WILL REQUIRE THE COURT TO DECIDE THE MERITS AND, IF MERITORIOUS, REQUIRE PAYMENT TO LAVIN

Holding Lavin's claim time-barred would not only be unreasonable but would serve no purpose. Three other Plan participants who have already appealed the Committee's denial of their "complete discontinuance" claims intend to file suit as soon as the Committee denies their appeal. *See* Lavin Dec. ¶12. Indeed, they would have already joined Lavin's suit but for Defendants' refusal to excuse them from exhausting the Plan's administrative appeals procedure. *See id*. Accordingly, even if Lavin's suit is dismissed, Defendants will have no repose from the "complete discontinuance" claim and the Court will have to decide its merits. *Mackensworth v. S.S. Am. Merchant*, 28 F.3d 246, 252 (2d Cir. 1994) (statutes of limitation designed to provide repose). Moreover, if the Court finds that a "complete discontinuance" occurred, the Plan would be required to vest fully all Plan participants, including Lavin. Dismissing Lavin's suit as time-barred would thus serve no purpose.

## CONCLUSION

For the foregoing reasons, Lavin's summary judgment motion should be granted.

May 17, 2010

/s/ Peter D. DeChiara
Jani K. Rachelson (JK 0121)
Peter D. DeChiara (PD 0719)
Zachary N. Leeds (ZL 7353)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
Tel:  (212) 563-4100
Fax:  (212) 695-5436
jrachelson@cwsny.com
pdechiara@cwsny.com
zleeds@cwsny.com

Attorneys for Plaintiff John E. Lavin

25