# EXHIBIT "B" TO DEFENDANT BRIEFLY STATED, INC. PROFIT SHARING PLAN'S ANSWER TO PLAINTIFF'S COMPLAINT

SAMUEL BREZEL
ATTORNEY AT LAW

44 WALL STREET
NEW YORK, NY 10005

TEL: (212) 797-9700 • FAX: (212) 797-9701
EMAIL: SAMBREZEL@BENEFITLAWS.COM

CERTIFIED MAIL

Graham Schell
Briefly Stated, Inc.
1359 Broadway
New York, N.Y. 10018

May 30, 2007

Re: Briefly Stated, Inc. Profit Sharing Plan (*formerly known as the Briefly Stated, Inc., Employee Stock Ownership Plan*) (hereinafter, the "Plan")

Dear Mr. Schell:

On behalf of my client, Mr. John Lavin, and pursuant to the Plan's claim procedures, the following constitutes a formal claim for *additional* benefits that are due to my client under the Plan.

As you know, Mr. Lavin was employed by Briefly Stated, Inc. (hereinafter, the "Company") from October 2, 2000 until March 30, 2005, when he voluntarily terminated employment with the Company. While employed by the Company, Mr. Lavin was an active participant in the Plan and accrued benefits thereunder. In accordance with the Plan's vesting schedule in effect at the time he terminated employment, Mr. Lavin had a nonforfeitable (*i.e.*, vested) interest in 40% of his *total* account balance (*i.e.*, accrued benefit) under the Plan, having completed four (4) years of vesting service.

Following the Plan's recent amendment which allowed for the distribution of a former employee's vested accrued benefit upon termination of employment, Mr. Lavin requested a single sum distribution of the balance credited to his account by accessing the Plan's automated web-based InterActive Account system.

At the time of his distribution, Mr. Lavin's *total* account balance, as reflected in his on-line account statement, had a market value of $1,496,500.50. However, the amount actually distributed to him was only $598,600.20. The reduced amount represents 40% of the balance credited to his account and is presumably attributable to his vested status under the Plan at the time he terminated employment.

In limiting the amount of Mr. Lavin's distribution to 40% of his account balance, the Plan has failed to consider the fact that, notwithstanding the vesting schedule in effect as of the date of his termination of employment, Mr. Lavin has become *fully* vested in his accrued benefit as a result of the Company's decision to discontinue making contributions to the Plan following the Company's acquisition by The Millwork Trading Co., Ltd., d/b/a Li & Fung USA ("Li & Fung USA").

Graham Schell
Briefly Stated, Inc.
May 30, 2007
Page 2 of 7

Section 411(d)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), provides *in relevant part* that a trust is not qualified unless the plan of which such trust is a part provides that upon a complete or partial termination of the plan or, in the case of a plan that is not subject to the Code's minimum funding requirements, upon a *complete discontinuance of contributions* under the plan, the right of affected employees to receive benefits accrued as of the date of such termination, partial termination or complete discontinuance is nonforfeitable.

A determination as to whether or not there has been a complete discontinuance of contributions is based on a consideration of all the relevant facts and circumstances surrounding the discontinuance. Among the factors to be considered in determining whether a suspension of contributions constitutes a complete discontinuance are:

(i)  Whether the employer may merely be labeling a complete discontinuance of contributions as a "suspension" in order to avoid the obligation of full vesting otherwise required in the case of a discontinuance, or for any other reason;

(ii) Whether contributions are recurring and substantial; and

(iii) Whether there is any reasonable probability that the lack of contributions will continue indefinitely.

*See*, Treas. Reg. § 1.411(d)-2(d)(1).

In describing the events that constitute a *complete discontinuance of contributions* for purposes of Section 411(d)(3) of the Code, the regulations provide that a complete discontinuance of contributions is to be distinguished from a "suspension" of contributions which is merely a temporary cessation of contributions by the contributing employer. On the other hand, a complete discontinuance may occur even though some amounts are contributed to the plan if such amounts are not substantial enough to reflect the intent on the part of the employer to continue to maintain the plan.

Following the Company's acquisition by Li & Fung USA in September of 2005, participants were notified in writing that no further contributions of employer stock would be made to the Plan. Although the notice only referred to contributions of employer stock, neither contributions of employer stock nor contributions of cash or other property were made to the Plan following the Company's acquisition. The notice also advised participants of a recent amendment to the Plan made in connection with the sale of the Company's shares under which individuals hired *after* September 30, 2005, would not eligible to become participants in the Plan. To the best of my client's knowledge, no provisions were made under the terms of the acquisition agreement for Li & Fung USA to adopt the Plan or to resume making contributions thereto. In fact, every effort has been made to disassociate Li & Fung USA from the Plan as evidenced by the fact that the Plan is being administered separately from the Li & Fung USA 401(k) Plan.

It is noteworthy that nowhere in its written communications did the Company attempt to assuage the concerns of participants who were affected by the discontinuance of contributions by describing it as a mere temporary cessation or suspension. Neither could the cessation of contributions be attributable to the Company's financial hardship

Graham Schell
Briefly Stated, Inc.
May 30, 2007
Page 3 of 7

or other administrative difficulty. Despite the self-serving statement contained in its written communications to participants that the Plan is not being terminated, the discontinuance of contributions following the sale of the Company's shares and the adoption of an amendment that resulted in freezing out employees hired after September 30, 2005 from being eligible to participate in the Plan, provides a strong inference that the cessation of contributions was both contemplated and agreed to by the parties prior to the sale and was intended to be permanent. Under Section 411(d)(3) of the Code, a complete discontinuance of contributions has the same effect on participants' accounts as a plan termination – in each case, participants are required to become 100% vested in their accrued benefit regardless of their vested status under the plan's vesting schedule.

More importantly, the Company's assertion that the Plan is not being terminated is in direct contradiction to the Plan's Summary Plan Description, updated as of June 30, 2004 (SPD). The second paragraph in Section 2 of Article XI of the SPD states that "[A] complete discontinuance of contributions by your Employer without the establishment of a successor plan shall constitute a termination." The immediately preceding paragraph sets forth the Company's right to terminate the Plan at any time and provides for the full vesting of participant accounts in the event of the Plan's termination. Thus, under the very terms of the SPD, it is not necessary that the Plan be formally terminated for participants to be vested in their accrued benefits. A mere cessation of contributions that, under the particular facts and circumstances, constitutes a complete discontinuance of contributions is sufficient to trigger the termination of the Plan with all of the ensuing legal consequences flowing therefrom.

The reasonable probability that the lack of employer contributions will continue indefinitely is further reinforced by an analyses of the cost that would be incurred in the event there was a resumption of contributions to the Plan. To retain its qualified status, the Plan must satisfy the Code's myriad qualification requirements including the minimum coverage rules under Section 410(b) of the Code and the nondiscrimination provisions set forth in Section 401(a)(4) of the Code and the regulations thereunder. Following the December 31, 2006 expiration of the special transition period allowed to a plan whose sponsor is involved in a corporate transaction described in Section 410(b)(6)(C) of the Code, compliance with the minimum coverage requirements and the nondiscrimination rules must be determined on a "controlled group" basis, taking into account for testing purposes not only former employees of the Company who are currently employed by Li & Fung USA, but *all* current employees of Li & Fung USA. As a result, any contributions made to the Plan in 2007 (and subsequent years) for the benefit of former Company employees would also have to benefit all or, at the very least, a significant number of Li & Fung USA employees. Given the large number of Li & Fung USA employees, the cost of compliance would be prohibitively expensive and unlikely to be undertaken by the Company. The probability that the lack of contributions will continue indefinitely is more than reasonable (and is perhaps almost a certainty) when one considers the fact that the largest share of any future contributions would have to be allocated to the accounts of Li & Fung USA employees who never worked for the Company and for whom the Company would have no reason to provide additional benefits.

Graham Schell
Briefly Stated, Inc.
May 30, 2007
Page 4 of 7

   Although Mr. Lavin terminated employment prior to the date of the acquisition and the ensuing cessation of contributions to the Plan, he continued to be a "participant" for purposes of the Employee Retirement Income Security Act of 1974, as amended (hereinafter "ERISA"). Under Section 3(7) of ERISA, a "participant" is defined as a current or former employee "who is or may become eligible to receive a benefit" from an employee benefit plan. Mr. Lavin retained his status as a Plan "participant" within the meaning of ERISA following his termination of employment since he was clearly entitled to receive a benefit under the Plan. For the same reason, Mr. Lavin retained his status as a Plan "participant" following the Company's acquisition and its announced intention to discontinue making contributions to the Plan.

   The Code requirement that participants in an individual account plan must be fully vested in their accrued benefit upon the complete discontinuance of contributions, applies both to active employees as well as to former employees who have not incurred a forfeiture as of the date of the complete discontinuance of contributions. The extent to which the full vesting requirements under Code Section 411(d)(3) apply to former employees who terminated employment *before* the plan's termination date is set forth in a General Counsel Memorandum (GCM) issued by the IRS in 1984. According to GCM 39310 (November 29, 1984), a participant's termination of employment does not trigger an *immediate* forfeiture of the participant's unvested benefits. Instead, the forfeiture of a participant's unvested benefits can only occur following the participant's receipt of a distribution that qualifies as a "cash out" distribution under Section 411(a)(7) of the Code, or after the participant incurs a "break-in-service" as defined in the plan. Based on the principle established in GCM 39310, the Service has consistently taken the position that a partially vested former employee who, as of the plan's termination date, has not incurred a break in service and has not received a qualifying "cash out" of the vested portion of his account, must be fully vested in the forfeitable portion of his accrued benefit when the plan is terminated.

   Although GCM 39310 sets forth the IRS' position regarding the scope of Code Section 411(d)(3)'s vesting requirements in the context of a "plan termination," the same principle would equally apply in the context of a "complete discontinuance" of contributions which, like a plan termination, triggers the full vesting requirement under Section 411(d)(3)(B) of the Code. After all, GCM 39310 addresses the scope of the Code's vesting requirements triggered by an event described in Code Section 411(d)(3), and a complete discontinuance of contributions is one of the events described in that Section. Based on the reasonable probability that the lack of contributions will continue indefinitely as described above, the cessation of contributions constitutes a complete discontinuance of contributions within the meaning of Code Section 411(d)(3)(B) and would have the same effect for vesting purposes as a complete termination of the Plan. Furthermore, as previously pointed out, under the terms of the SPD, the discontinuance of contributions to the Plan constitutes a termination of the Plan.

   Section 1.411(d)-2(d)(2) of the Treasury Regulations contains a timing rule under which a complete discontinuance of contributions becomes effective no later than the last day of the taxable year of the employer following the last taxable year for which the employer made a substantial contribution to the plan. The last substantial contribution

Graham Schell
Briefly Stated, Inc.
May 30, 2007
Page 5 of 7

made to the Plan was in 2005. Accordingly, the complete discontinuance of contributions became effective on the last day of the Company's 2006 tax year, or December 31, 2006.

Pursuant to Section 1.22 of Article I of the Plan, the "forfeiture" of a participant's account occurs on the *earlier* of: (a) the date on which the vested portion of the account balance is distributed to the participant, or (b) the last day of the Plan year in which the participant incurs five (5) consecutive one-year breaks in service. Mr. Lavin received a distribution under the Plan in March of 2007. Whether the event that triggered the full vesting requirement of his account occurred in 2005 following the cessation of contributions as would be dictated by the SPD, or such event first occurred on December 31, 2006 in accordance with the timing provisions contained in Section 1.411(d)-2(d)(2) of the Treasury Regulations, Mr. Lavin did not incur a forfeiture of any portion of his unvested account balance prior to the time he became fully vested in his account as a matter of law by virtue of the discontinuance of contributions to the Plan. Although Mr. Lavin was only vested in 40% of his account balance at the time he terminated employment, he did not suffer a forfeiture of the remaining 60% of his account under the terms of the Plan until he incurred a five-year break in service or received a "cash-out" distribution of his vested account balance. Following his termination of employment in March of 2005, the non-vested portion of his account was merely *forfeitable* pending a five-year break in service or the earlier "cash-out" of his vested benefit. Neither of the foregoing events occurred before the triggering event that required Mr. Lavin to become 100% vested in the unvested portion of his account balance.

The IRS' position in GCM 39310 has been followed by the courts on facts similar to the present case. See, *Bouchard v. Crystal Coin Shop, Inc.*, 843 F.2d 10 (1st Cir. 1988); *Flanagan v. Inland Empire Electrical Workers Pension Plan & Trust*, 3 F.3d 1246 (9th Cir. 1988); *Herrmann, v. E. W. Wylie Corporation and First Trust Company of North Dakota*, 766 F. Supp. 800 (D.C. N.D., 1991), where the court, relying on GCM 39310, required partially vested employees who terminated employment prior to the date of the plan's termination to become fully vested in the forfeitable portion of their account upon the subsequent termination of the plan. In each of the referenced cases, terminated participants did not incur a period of consecutive breaks in service that was long enough under the terms of the plan to incur a forfeiture of their unvested benefits. Nor did they receive a distribution of the vested portion of their account balance prior to the plan's termination date.

The court in *Herrmann* also rejected the argument put forth by the defendants that the decision to deny full vesting to the participant was entitled to a deferential standard of review. Under that standard, the defendants argued, their decision was reasonable and therefore not subject to judicial review unless shown to be "arbitrary and capricious." In rejecting the defendants' argument, the court cited the Fifth Circuit in *Penn v. Howe-Baker Engineers, Inc.*, 898 F.2d 1096, 1100 (5th Cir. 1990) where the court stated that the high level of deference accorded to plan fiduciaries under the "arbitrary and capricious" standard of review is limited to questions involving plan interpretation and not to questions involving interpretation of applicable law. According to the Fifth Circuit, where questions of law are involved, the court will apply the *de novo* standard of

review. In addition, the Court stated that where a fiduciary's interpretation of the terms of a qualified plan, although reasonable on its face, results in the plan's failure to comply with the Code's qualification requirements, it will be deemed to be "arbitrary and capricious" and subject to *de novo* review. The decision to distribute only 40% of Mr. Lavin's account balance under the Plan and the resulting forfeiture of the remaining 60% of his account violates the Code's minimum vesting requirements and imperils the Plan's qualified status under the Code. Accordingly, the Plan's decision to deny Mr. Lavin the benefits that he is entitled to under applicable law is subject to *de novo* review.

Mr. Lavin's claim of entitlement to the unvested portion of his account balance would prevail even under the strict standards applied by the Sixth Circuit in *Borda v. Hardy, Lewis, Lewis, Pollard & Page, P.C.* 130 F.3d 1062 (6th Cir. 1998). In *Borda*, the Sixth Circuit held that the right of former employees to become fully vested in their accrued benefit upon the termination of the plan is limited to those employees who are "affected" by the plan's termination. Like Mr. Lavin, the plaintiff in *Borda*, was only partially vested in his accrued benefit when he terminated employment. Approximately three-and-a-half years after terminating employment, the employer was dissolved and the plan was terminated. Mr. Borda claimed entitlement to the unvested portion of his accrued benefit under the plan. As of the date of the plan's termination, Mr. Borda had not received a distribution of the vested portion of his accrued benefit, nor had he incurred a five-year break in service. In rejecting Mr. Borda's claim, the Sixth Circuit ruled that the full vesting requirement under Section 411(d)(3) of the Code applies only to "affected employees" and not to former employees who, owing to the dissolution of the plan sponsor, had no prospect of being rehired and meeting the plan's vesting requirements. According to the Sixth Circuit, Mr. Borda was not affected by the plan's termination because he had no prospect of reviving his past service credits and increasing the vested percentage of his accrued benefit by someday returning to work for his former employer who no longer existed.

Unlike the facts in *Borda*, Mr. Lavin never lost the ability to revive his past service credits when the lack of contributions to the Plan ripened into a complete discontinuance of contributions which, in turn, gave rise to the Plan's termination pursuant to the terms of the SPD. Had there not been a complete discontinuance of contributions which resulted in the effective termination of the Plan, Mr. Lavin's ability to increase his vesting percentage in the unvested portion of his account would have been preserved through his ability to be reemployed by Li & Fung USA, the successor employer. The termination of the Plan effectively closed off any opportunity that Mr. Lavin had to further vest in his accrued benefit. As such, Mr. Lavin was clearly an "affected employee." *

---

\* The Sixth Circuit's decision in *Borda* is somewhat aberrant in that it is neither supported by GCM 39310 nor by the legislative history. The pre-ERISA predecessor to Code Section 411(d)(3) which required full vesting upon a plan's termination or upon the complete discontinuance of contributions to the plan, did not contain the restrictive language. The regulations extended the full vesting requirement to partial terminations, but only for those employees who were *affected by* the partial termination of the plan (*i.e.*, those employees who lost their job in connection with the partial termination). When partial terminations were first added to Code Section 411(d)(3), Congress used the phrase "affected employees" to make it

      Based on the foregoing, Mr. Lavin is entitled to the distribution of his entire account balance plus accrued interest. The reallocation of the forfeitable portion of Mr. Lavin's account to the accounts of current active participants not only violates the terms of the Plan, the SPD and the Code's plan qualification requirements, but also constitutes a breach of ERISA's fiduciary duty which requires a plan fiduciary to discharge his duties with respect to the plan solely in the interest of participants and beneficiaries and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with applicable law.

      We look forward to your favorable response.

Sincerely,

Samuel Brezel

SB:rb

cc: Anthony E. Cristiano
    John Lavin

---

clear that those who remain employed following an event that gives rise to a partial termination do not get the benefit of full vesting. Neither common sense nor the legislative history suggests that Congress intended to alter the pre-ERISA rule under which *all* employees must become fully vested when there is a complete (as opposed to a "partial") plan termination or when there is a complete discontinuance of contribution under the plan.

The Service did not concur with the decision in *Borda* and held that Mr. Borda should have been 100% vested upon plan termination. As a result of the Service's non-acquiescence, the *Borda* decision cannot be relied on outside the jurisdiction of the Sixth Circuit where the Service will challenge any forfeiture of unvested benefits on the basis of the *Borda* decision.