Jani K. Rachelson (JK 0121)
Peter D. DeChiara (PD 0719)
Zachary N. Leeds (ZL 7353)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
Tel:  (212) 563-4100
Fax:  (212) 695-5436
jrachelson@cwsny.com
pdechiara@cwsny.com
zleeds@cwsny.com

Attorneys for Plaintiff John E. Lavin

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                                   :

JOHN E. LAVIN,                                 :

                        *Plaintiff*,       :

                                 :

      - v. -                           :

                                 :

BRIEFLY STATED, INC. and BRIEFLY STATED :   Case No. 09-Civ.-8610 (CM)
INC. PROFIT SHARING PLAN,          :   (FM)

                                 :

                     *Defendants*.    :

                                 :
-------------------------------------------------------------X

## <u>PLAINTIFF'S STATEMENT OF MATERIAL FACTS</u>

        Pursuant to Rule 56.1(a) of the Local Civil Rules of this Court, Plaintiff John E.

Lavin ("Lavin") submits this statement of material facts as to which he contends there is no

genuine issue to be tried:

        1.     Lavin, who served as chief financial and chief operations officer of

Defendant Briefly Stated, Inc. ("BS"), was employed at BS from October 2000 through March

2005.  May 10, 2010 Declaration of John E. Lavin ("Lavin Dec.") at ¶2; Complaint ¶8; Plan's

Answer ¶8.

2.      Prior to the acquisition of BS by Li & Fung USA ("LF"), Brad Egna ("Egna") was BS's owner and president.  Transcript of April 1, 2010 deposition of Alan Beckerman ("Beckerman"), at 28**.**

3.      In October 2004, when Lavin informed Egna of his decision to resign, Egna asked him to stay and Lavin agreed to stay a few more months.  Lavin Dec. ¶3.

4.      At one point before Lavin left the company, Egna told him that he was concerned that he might lose other key employees.  *Id*. ¶5.

5.      Egna, who was negotiating to sell BS to LF, mentioned that if the stock in BS's employee stock ownership plan ("ESOP") were sold, that would put a large amount of cash into the plan, and employees might be tempted to leave the company if this cash were made available to them.  *See id*. ¶5.

6.      In September 2005, LF purchased BS from Egna.  *See* Plan's Answer ¶11; *see also* D354.

7.      Under the stock purchase agreement, LF paid part of the purchase price initially; Egna's receipt of the balance of the purchase price was made contingent on BS achieving certain pretax profits over a three-year "earn out" period that followed the purchase. Beckerman 32, 34; D362 (§§2.2, 2.4).

8.      The stock purchase agreement provided that Egna, who was to continue as BS's president during the three-year "earn out" period, would receive an annual bonus the size of which would depend on the pretax profits that BS earned.  Beckerman 30-32; D413 (§5(b)).

9.      As part of its acquisition of BS, LF purchased all of the BS shares that were then in BS's ESOP, putting about $22.6 million into the ESOP.  Beckman 17; D119.

10.     The parties to the stock purchase agreement decided to keep the ESOP in

2

place out of a concern that without it, "some employees may leave." Beckerman 99.

11.     BS was a profitable company when LF acquired it and LF wanted to avoid any disruptions during the "earn out" period. *Id*. 34-35.

12.     LF wanted to avoid the loss of key employees. *Id*. 35-36.

13.     At the time of the acquisition, Egna expressed his concern that he "not lose his key people." *Id*. 98.

14.     Egna did not want to lose key employees in part out of his concern about earning the contingent payments during the "earn out" period. *Id*. 99.

15.     Although the stock purchase agreement required LF to maintain and not terminate the ESOP, it did not require that contributions be made to it. Beckerman 36-37.

16.     Effective January 1, 2006, the ESOP converted into Defendant Briefly Stated Inc. Profit-Sharing Plan ("Plan"). D6-D7; Beckerman 51.

17.     As of January 1, 2006, the Plan was closed to new participants. D15 (§4.01(b)); Beckman 53.

18.     The Plan provides that the BS Board of Directors ("BOD") has sole authority to decide whether an employer contribution -- referred to as a "Profit Sharing Contribution" -- will be made to the Plan for a given year. D17 (§6.01(b)); Beckerman 55.

19.     Section 6.02 of the Plan provides in part that "Profit Sharing Contributions, if any, shall be paid by the Company in cash to the Trust Fund …" D17.

20.     Section 8.02 of the Plan provides in part that: "All contributions made on behalf of a Participant shall be paid to the Trustee …." D19.

21.     The deadline under the Plan for making a contribution is September 15 of the year following the year for which the contribution is made. D17 (§6.02); Beckerman 58.

3

22.     After September 2005, the BOD was composed of five LF executives who met twice a year, keeping minutes of their meetings.  Beckerman 9-14.

23.     At no time after the Plan became effective on January 1, 2006 did the BOD discuss putting additional money into the Plan.  *See* May 6, 2010 Declaration of Peter D. DeChiara ("DeChiara Dec."), at ¶¶3-6.

24.     No additional employer money was put into the Plan at any time after January 1, 2006.  Beckerman 18-19.

25.     The Plan's Form 5500 reports to the IRS for 2006, 2007 and 2008 indicate that no contributions were made to the Plan for those years.  D192 (no entry for line 2a(1)); D200 (same); D207 (same).

26.     BS earned pretax profits of $18.4, $17.9 and $14.6 million in 2006, 2007 and 2008, respectively, on gross sales of $107, $103 and $117 million, respectively.  Beckerman 69-70.

27.     As of 2009, BS continued to be profitable.  Beckerman 35; Beckerman 70-71 (setting forth 2009 pretax profits).

28.     The Plan requires that a participant complete seven years of service to vest fully in his account.  D22 (§10.01(b)).

29.     Under the terms of the Plan, if a participant terminates employment before fully vesting, the non-vested portion of his account is treated as a forfeiture.  D22 (§10.02(a)).

30.     At the end of 2006, the Plan had a forfeiture balance of $998,000.  D113.

31.     In February 2007, the Plan's Administrative Committee ("Committee") decided to allocate, for 2006, approximately $544,000 of this forfeiture money to other Plan participants.  D111-D113.

4

32.     The BOD never decided that there would be an employer contribution for 2006.

33.     The BOD never decided that the allocation of forfeiture money for 2006 constituted an employer contribution.

34.     In his valuation report for 2006, which issued in February 2007, the Plan's actuary, David Weinstock, referenced the 2006 forfeiture allocation but nonetheless concluded that "[t]here was no contribution made" to the Plan for 2006.  D466.

35.     Weinstock is an actuary with 25-30 years experience, including with profit-sharing plans.  *See* Transcript of April 6, 2010 deposition of David Weinstock ("Weinstock") at 5.

36.     Weinstock considered forfeiture allocations and employer contributions separately in his valuation report for 2005.  *Compare* D670 (line 3(b)) (forfeiture allocation) *with* D669 (line 2) (employer contribution); *see* Weinstock 21-24.

37.     Since making the forfeiture allocation for 2006, the Plan has made no further forfeiture allocations.  Beckerman 78.

38.     The amount in the Plan's forfeiture account (which includes what was the balance of Lavin's account) has since grown to over $3.3 million.  Beckerman 100.

39.     At one point, Egna tried to dissuade BS employee Farrisha Mohammed from resigning by telling her that it would be crazy for her to quit because employees who stayed with the company would share in the forfeiture money.  Lavin Dec. ¶6.

40.     After LF's acquisition of BS, BS employees who were Plan participants also became participants in LF's 401(k) plan ("LF Plan").  Beckerman 47; D124.

41.     Like all the other eligible participants in the LF Plan, eligible BS

employees received an employer "match" contribution to their LF Plan accounts.  Beckerman 50.

42.     In addition to BS employees, the LF Plan includes employees of six other companies that LF acquired.  D218.

43.     The 401(k) plans of these six other LF subsidiaries were merged into the LF Plan, D218 n.1, leaving BS employees as the only employees of an LF subsidiary who participate in their own company's plan as well as in LF's Plan.  D218.

44.     On December 20, 2006, Weinstock told Graham Schell, an executive in LF's human resources department, Beckerman 44, that if Weinstock did the "coverage tests" under §410(b) of the Internal Revenue Code ("IRC"), 26 U.S.C. §410(b), the Plan would "likely fail" and "have to include other participants" in the Plan.  D133; Weinstock 6-8.

45.     Schell responded by writing in a December 20, 2006 email that "this raises a huge red flag for me."  D133.

46.     Schell further wrote in the December 20, 2006 email:  "Dave [Weinstock] is very concerned as this will continue to be an issue for 2007, 2008 and forward."  *Id*.

47.     LF, as BS's parent, was part of BS's "controlled group."  DeChiara Dec., Ex. A at 5; Beckerman 19.

48.     At the time that Weinstock advised Schell in December 2006, he believed the Plan would likely fail the coverage tests because LF had so many more employees than BS.  Weinstock 10.

49.     In 2007 and 2008, the LF Plan had 1,281 and 1,305 participants, respectively, Beckerman 26-27, while the BS Plan had 52 and 46.  *See* D197, 204.

50.     Weinstock did not perform §410(b) coverage testing for 2006 that took into account LF employees because, as he later learned, a statutory one-year transition period for

6

newly acquired companies excused consideration of LF employees for that year.  Weinstock 9.

51.    Had there been contributions to the Plan in 2007 or thereafter, the IRC §410(b) testing would have required consideration of the LF employees.  DeChiara Dec., Exhibit A, at 6.

52.    In March 2007, Lavin received a distribution from the Plan of $598,600.20, which represented 40% of his account balance.  D83; Lavin Dec. ¶7.

53.    Lavin had completed four years of service with BS, D82, and under the Plan's vesting schedule, a participant with four years of service is 40% vested in his account. D22 (§10.01(b)).

54.    In his May 30, 2007 claim letter, Lavin asserted -- based, among other things, on the absence of contributions after 2005 and the closing of the Plan to new participants -- his belief that BS had decided "to discontinue making contributions to the Plan following the Company's acquisition by [LF]."  D74.

55.    Lavin's May 30, 2007 letter claimed that since the last contribution made to the Plan was in 2005, the "complete discontinuance" became effective on the last day of the following year, December 31, 2006.  D78.

56.    The Committee, which included Egna and Beckerman, denied Lavin's claim, stating in its November 19, 2007 denial letter that there had been no "complete discontinuance of contributions" within the meaning of IRC §411(d)(3)(B).  Beckerman 79-80; D86, D89.

57.    In addition to relying on IRS regulations interpreting the statute, D85-86, the Committee cited the Internal Revenue Manual, which it read as providing that "a complete discontinuance of contributions cannot occur unless and until substantial contributions are not

made for 3 out of five years."  D86 (emphasis added).

58.     The November 19, 2007 denial letter pointed out that there had been contributions to the ESOP each year from 2000 through 2005.  D86.

59.     It also asserted that there had been a contribution in 2006 since "forfeitures function as deemed Profit Sharing Contributions."  D87.

60.     In reaching its determination that "forfeitures function as deemed Profit Sharing Contributions," the Committee in its deliberations did not discuss any provisions of the Plan other than Section 10.04(a).  Beckerman 86.

61.     In reaching its determination that "forfeitures function as deemed Profit Sharing Contributions," the Committee in its deliberations did not discuss Sections 6.02 or 8.02 of the Plan   Beckerman 86.

62.     In reaching its determination that "forfeitures function as deemed Profit Sharing Contributions," the Committee in its deliberations did not consider Weinstock's 2006 valuation report.  Beckerman 93-94.

63.     Lavin appealed the Committee's denial of his claim.  D90-94.

64.     By letter dated March 31, 2008, the Committee denied his appeal on the same grounds that it denied his claim, D95-105, asserting, once again, its interpretation of the Internal Revenue Manual as setting a minimum of no substantial contributions for three out of five years before a "complete discontinuance" can be found, D101.

65.     Egna and Beckerman were the only two members of the Committee present when it denied Lavin's appeal.  *See* D114.

66.     At their Committee meeting, Egna pointed to the contributions made to the ESOP through 2005 and also referred to "the Plan's mechanism for recharacterizing forfeitures

8

as profit sharing contributions." D115.

67. There was no discussion at the Committee meeting of any Plan provision other than Section 10.04(a). Beckerman 90.

68. Nor was there any reference at the Committee meeting to Weinstock's 2006 valuation. Beckerman 93-94; D466.

69. Because he did not want to risk filing a meritless lawsuit, Lavin decided to wait before suing to see whether there were contributions to the Plan for the three years after 2005, namely, for 2006, 2007 and 2008. *See id.* ¶9.

70. The Plan's deadline for making a contribution for 2008 was in September 2009. D17 (§6.02); Beckerman 58.

71. On April 9, 2010, the Committee denied the claims of three other former BS employees -- Lisa Pomper, Curtis Nesbit and Jeffrey Stock -- who, like Lavin, claimed that the Plan experienced a "complete discontinuance of contributions" effective December 31, 2006 and therefore that they were entitled to the full amount in their Plan accounts, despite their not having fully vested under the Plan's vesting schedule. *See* Lavin Dec. Ex. A.

72. These three, who are represented by the same counsel as Lavin, *see* Lavin Dec. ¶12, appealed the Committee's decision by letter dated April 22, 2010, *see id.*, Ex. B.

73. These three sought to join Lavin's suit, but Defendants denied their request to be excused from exhausting the Plan's administrative claims procedure. *Id.* ¶12.

May 17, 2010

/s/ Peter D. DeChiara
Jani K. Rachelson (JK 0121)
Peter D. DeChiara (PD 0719)
Zachary N. Leeds (ZL 7353)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
Tel:  (212) 563-4100
Fax:  (212) 695-5436
jrachelson@cwsny.com
pdechiara@cwsny.com
zleeds@cwsny.com
Attorneys for Plaintiff John E. Lavin

10